Good morning, Your Honors. My name is Richard Hikita. I represent the objector, the appellant, Henry Gonzales. I'd like to reserve two minutes for rebuttal. All right. Watch your clock. It runs down. Your Honors, this is a classic example of a collusive reverse auction. Your Honor, in this case, the applicable legal standard, as set forth in the Ninth Circuit in inmate Bluetooth, is the key question is that occlusion analysis is whether class counsel bargained away something of value to the class. And, Your Honors, there are numerous instances of red flags in this particular settlement agreement that were approved by the district court. Therefore, we submit that the district court clearly abused his discretion in in signing the final approval order. The first issue I want to address, Your Honor, is that the appellees have have misconstrued the applicable legal standard. They indicate that the applicable legal standard is a very, very narrow, very narrow standard of review of the class action settlement. But, Your Honor, the Ninth Circuit has made it very clear that that the standard is much more, through the higher level of scrutiny, applied when a class settlement is entered into before a contested class certification motion, which is exactly what happened in this instance. There was no contested class certification motion, and a class settlement occurred before any contested class certification motion could ever be filed. So, therefore... Well, that's true, but a similar class had been approved in the other case in which your firm was counseled. So in terms of whether there was a legitimate class, it seems that there was pretty good indication there was. Well, Your Honor... As to the class certification question, just that. Well, Your Honor, I mean, there's no question that in this instance, regardless of what standard is applied, that the courts, including the Ninth Circuit, applies heightened scrutiny when it comes to reviewing a class settlement. I understand that, but I just said whatever scrutiny you're going to apply, we have pretty good reason to think that it's a legitimate class. Well, let me address the merits, Your Honor, in terms of the class settlement in this instance. There's numerous instances of red flags indicating that the class settlement should not have been approved, and that there was collusion going on, even if it wasn't over – even if there aren't necessarily overt acts. Now, the district court's findings as to collusion, is that a fact finding? How do we review that? He looked at that. He thought there wasn't collusion or a reverse auction or whatever you're calling it. Well, yes, it is a... As a factual matter. Now, I'm not talking about the structure of the settlement. I'm talking about the circumstances of the fact that there were competing settlement negotiations going on. Is that what you're arguing now, or are you arguing about the content of the settlement agreement? Well, I'm now arguing about the content of the settlement agreement. Okay. But let me just start with, Your Honor, the Judge Tucker of the Central District, in her order in the Fernandez case... Well, that's totally irrelevant. I mean, it wasn't her case. She said it wasn't her case. She said it's up to this judge to decide, and that's what it's up to. Well, Your Honor, we — I respectfully disagree. Her — the case in front of her was an overlapping class. It involved the same types of claims as per the amended version of the Gallucci complaint. The original complaint did not include the products at issue, nor the additional class members who were added via the amended complaint. The original complaint in which one, which case? I disagree. I'm referring to the original complaint in the Gallucci case. In the Gallucci case. Okay. Right, which involved only the product, the off-sale-o product and the children's off-sale-o product, and one single putative class representative. The settlement was expanded to include all 800 products. Correct, Your Honor. And that's a huge... What was wrong with that, in your view? Well, Your Honor, in November — on November 16, 2011, as per the mediation in the Gallucci case, a binding stipulation for settlement was entered into. It was signed off by both sides, by both Gallucci and the defendants in that case. That settlement, at that time, it only involved the single product, off-sale-o and off-sale-o within the scope of that release. So three months later, Your Honor, and by the way, that settlement, that stipulation for settlement provided that the motion for preliminary approval was supposed to be entered into, was expected to be entered into by the next month, December of 2011. So was that settlement approved? Or was that settlement approved? No, Your Honor. That settlement, three months later, three or four months later, morphed into... But it was rejected by the board, wasn't it? Isn't that the one that was rejected by the board of directors? So they went back to mediation. Well, Your Honor, that's the Respondent's position. Wait. So when you were using the word settlement, you were talking about the MOU? Yes, the MOU, which was presided over by the mediator. What's the relevance of that? Just forget about that settlement. Let's look at the one they actually entered. Well, Your Honor, it's very significant, because the MOU, the parties represented that that was going to be a binding, binding settlement. But it was expressly subject to the board's approval. But, Your Honor, that MOU totally morphed into a totally different settlement agreement. Right, it did. It did. Okay, fine. One product to over 800 products, Your Honor. Right, okay, it did. So the release was way overbroad. Well, that's the question. The question isn't whether it morphed into something else. The question is, is there something wrong with what ultimately happened? What about the thing that troubles me about it is that it's all products and it's nationwide settlement. So that means it's binding on every single person, whether or not California law is more narrow or more broad in the United States for this particular period of time. That's correct, Your Honor. It is a ‑‑ it's astounding in terms of its breadth. It covers 12 years, Your Honor. I mean, California, under California law, the statute of limitations for these consumer protection claims are typically three or four years. So, and here we have a release that encompasses 12 years. Well, what's that? I mean, so they're releasing things that don't exist. That doesn't seem like a problem. But ‑‑ Well, but it goes to ‑‑ it goes to ‑‑ it goes to a point about other States may have. Both of those problems is a different and legitimate problem. I mean, the time frame, I mean, I don't understand what possible difference that could make if they're releasing claims that couldn't be brought anyway. That doesn't seem like a very big problem. Well, it goes to the issue about the fact that this is a nationwide release of claims. Well, the nationwide part I understand, but the time period I don't understand. Well, the time period relates to the statute of limitations, and whether there's a different ‑‑ whether a different equitable tolling or some sort of a defense to the statute of limitations could be applicable State by State. So that, in fact, in this case, Your Honor, the plaintiff's counsel actually argued that the statute of limitations, the three or four year statute of limitations had ‑‑ This is the part I don't understand. Is it true that the only ‑‑ I mean, as to the actual monetary relief here, nobody seems to think that there was ‑‑ could be any available damages other than return of the price of the product. Is that right? Has anybody ever argued that any plaintiff in any case like this, even if successful, could get anything other than a return of their ‑‑ of the money they spent? In this type of case, Your Honor, involving this type of product where the product is basically alleged to be basically a placebo. Right. It has no value other than its labeled use. And when it doesn't have that ‑‑ have the intended effect, it's basically a placebo. I know, but that's what I'm ‑‑ Harmful, right? There's no tort injury or anything here. It's not hurting anybody. It's just wasting their money. Well, yes, that's under ‑‑ it's very clear under the California Supreme Court case authority that it's definitely ‑‑ it's an injury. It's a cognizable injury. It is an injury, but I was asking you a specific question and I still haven't gotten an answer, which is that the only damages are the money paid for nothing, essentially. In other words, whatever they pay, they should get back. Yes, that's their actual damages. There's no other damages. There's no ‑‑ well, there's no psychic injury being alleged by ‑‑ Okay. So, all right. Class members. And if it turns out that ‑‑ now, here you have a cap of $5 million. I understand that. And the fees came out of that. They had a claims procedure. If it turns out, and I don't know where it stands now, but at least the suggestion is that everybody who makes a claim is going to get everything they're due, then what's the problem if that happens? Well, Your Honor, the problem is that, first of all, the scope of the release, it's so extremely broad, Your Honor, that it covers over 800 products. Okay. But still, if nobody could get more than their money back and everybody gets their money back, then everybody's getting what they're due. So there's no way there could be any other suit that would get any different money. Well, it's not a foregone conclusion that everybody's going to get their money back. I understand. I suppose they do. In fact, well ‑‑ If I suppose they do, is there then no problem? But, Your Honor, the settlement agreement expressly ‑‑ the settlement agreement as framed does not provide 100 percent full recovery to the class members. Okay. That's all I want to know about. And because the individual amounts are capped, is that why? Yes. Because there are highly restrictive caps. It's $50. If you don't have a ‑‑ if you don't keep a receipt, it's capped at $50 per, I think, either claimer or household, and it's definitely $100 if you happen to hold on to a receipt per household. How much do these products individually cost, and what's the price range for them? It varies, but anywhere ‑‑ What are we talking about, $10? I think there are some products that go into the 20s, 25, possibly $30. And, Your Honor, this is $100 if you have ‑‑ if you kept a receipt per household. If you have multiple users ‑‑ Unlikely people kept receipts for these sort of homeopathic products, right? Because it's not like a prescription where you might keep a receipt for purposes of ‑‑ Right. Right. So if you don't keep a receipt, you're capped at $50. You're capped at half the amount you would get if you kept a receipt. And if you litigated it, what would you get? I'm sorry? If this were litigated and there was a damages award and ‑‑ Over $700 million. But wait a minute. That's what I'm trying to understand. You're saying, I understand there's a big dispute about that, but let's assume you're right. Let's suppose the sales were $700 million. But that doesn't mean that the relief in a litigated case is going to get $7 million back to the claimants because you still have the same problems, i.e., people without receipts and people who don't make claims. I mean, if suppose the case were litigated and you decided that there's potentially $700 million, you still have to find the people and you still have to give them the money, right? Well ‑‑ So that's why the $700 million seems meaningless to me. Well, Your Honor, in terms of the actual ‑‑ where the actual money should go, I mean, that could potentially ‑‑ Am I right about that, though, so far, that if litigated, you'd still have the same relief problems? Well, Your Honor, I mean, in terms of who would get the money, that could be ‑‑ Your Honor, I'm sure the court could ‑‑ the district court could issue an equitable basis, whether it's a Cypress award to a consumer fund or some sort of ‑‑ But that doesn't have anything to do with whether the individuals in the class are getting reimbursed. Well, Your Honor, here's the fundamental problem. The district court did not make findings of fact as to what the reasonable range of the maximum settlement value is. Those findings are not contained in the district court. So on that basis alone, Your Honor, we submit that the order should be ‑‑ Well, isn't that partly because, and maybe this doesn't make a difference, isn't that partly because this was a negotiated settlement that was presided over by a respected retired former magistrate judge and the district court relied on the arm's length negotiation between the parties and the magistrate judge's facilitation of that settlement? Well, Your Honor, that's ‑‑ Doesn't that count for something, I guess, is my question? And, Your Honor, that's ‑‑ let me address that by noting that, despite the fact that the district court did rely upon the mediators presiding over a portion of the ‑‑ or the ‑‑ during the mediation proceedings, the problem is that the actual evidence in the record is dated November 16, 2011. Your Honor, that was back when there was only one product at issue as part of the contemplated settlement discussions and only a single class member as a class representative. So it's like apples and oranges. The mediators vouching for the noncollusiveness, collusive nature of the settlement back then on November 16, 2011, it dealt with a totally different proposed settlement agreement, and that's another error. Did you ‑‑ did your firm represent the class in De La Rosa v. Boron? That's correct, Your Honor. And what was the amount of the attorney's fees that your firm got in that class settlement? Your Honor, I honestly am not familiar with that. I didn't work on that matter in terms of the fee award. Oh, surely you must know. I mean, one of the things you're challenging is the amount of the attorney's fees. Your Honor, I'm not ‑‑ I'm sure it fell within the ballpark of all these comments. What about the settlement in that case in terms of the amount of claims that people got? Is it different? Do people get more than $100 each with receipts and more than $50 without receipts? Your Honor, I'm not ‑‑ unfortunately, I'm not ‑‑ I'm not privy to that, so I'm not aware of that. Maybe opposing counsel knows. Well, some of it's in the briefing, so that seems a little unlikely that you're not. I mean, there's a statement, for example, in the briefing that says that the relief was extremely similar, as was the notice. Is that wrong? Your Honor, I've ‑‑ I'm not going to disagree with that statement. I have no basis to disagree with that statement. All right, counsel, you went to reserve two minutes, and you're over two minutes. So we'll hear from the other side now. Thank you, Your Honor. Thank you. Good morning, Your Honors. Andrew Silverman. I represent Boron and Boron USA. I'm here on behalf of all of the appellees, although counsel for the class is available if the court has any questions. Just out of curiosity, I had the impression until I got on the bench that we were going to hear from the Gallucci Class II. There was a counsel there. Do you know anything about that? I didn't think that they had filed anything saying that they were actually going to be presenting today, but we do have counsel for Gallucci here if the court does have questions. Well, who's here for Gallucci? Justice, Your Honor. All right. Thank you. All right. Proceed. After six months and 13 mediation sessions with a former magistrate judge acting as a neutral mediator, the parties reached a fair, adequate, and reasonable settlement that provided three substantial benefits to the class. First, up to $100 in money back for class members dissatisfied with previous purchases. Second, changes to the label beyond that which is required by the FDA. And third, an agreement for Boron to maintain its promise to provide full refunds to dissatisfied customers for purchases made before the rollout of the new labels. How's the class claims process going? The claims process has concluded in terms of the number of claims that will come in. Under the settlement, the claimants had up to 45 days after judgment in the district court. So at the time of the fairness hearing, the district court judge was notified that there were approximately 4,200 claims. At this point, now that the claim period is closed, there's approximately 5,800 claims that have come in. How many of those people have receipts? I don't have the breakdown of how many of those people have receipts, Your Honor. But the at least the total number at this point is 5,800 claims. And how does that – I guess the key question is, is it exhausting the fund or not exhausting the fund? It would not exhaust the fund, Your Honor. Even if there were – even if each person had their receipts and they received $100, 5,800 claims, $100 a claim would be $580,000 of the fund, which would leave even after attorneys' fees and notice and everything else still approximately $3 million in the fund. That money is not going to revert to Boron. What's going to happen to it? That's correct, Your Honor. It won't revert to Boron. Two things will happen. Half of the money will go to the claimants in a pro rata manner. So the claimants will get $1.5 million. The other $1.5 million will go to a CyPray beneficiary. In this case, it's Consumer Union, which is the organization that issues consumer reports, which, among other things, looks at products like over-the-counter products and, you know, tells the public what they think about those products and whether or not those products are efficient. As this Court said, in the Dennis v. Kellogg's case, that's precisely the sort of CyPray beneficiary that this Court is looking for. In particular, in Dennis v. Kellogg, this Court said for false advertising claims, the appropriate organization is one that's dedicated to protecting consumers and addressing injuries from false advertising, which is precisely what Consumer Union does with, amongst other things, the consumer report that it issues. There, Judge Berzon had asked a question about whether or not the judge's conclusions with regard to collusion were a question of fact or a question of law. And the answer is that it is a question of fact. The district court had before it the entire record, a record that Judge Tucker did not have in the Fernandez case. And the judge, having looked at that entire record, concluded that there was no evidence of collusion. Despite the arguments that NTG made before the district court and the same arguments that are repeated here, the Court concluded there just wasn't evidence of collusion. There wasn't a dueling, secret, reverse auction. There was no evidence that the counsel had done anything to collude with counsel for the class. What's the status of the label modifications? Yes, Your Honor, the label modifications are ongoing right now because there has not been a final judgment in this case, meaning the conclusion of appellate proceedings. It's not required that the labels actually have been changed as of yet, however. Boron has been rolling out new labels, including for Acillo, and those changes to the label are ongoing. And are changes in the labeling going to be made to all 800 products? I don't believe that Boron continues to have 800 products in the United States, but yes, the changes will be made to the products that are included in the settlement. And those products are identified in ER 1192. There is a list of 23 enumerated products, and then the 24th category is a catch-all of the generics and other branded versions of those 23 products. One thing that just sort of jumped out at me about this and seemed odd is the expansion of the coverage of the settlement from the one product to the 800 products. And I guess that was effectuated by an amended complaint, right? Yes, Your Honor. How did that happen? Sure. Well, so let me make a couple of points on that. The first is the fact that the complaint was amended, that additional claims and additional claimants and class members was added is nothing new. This Court in Officers for Justice affirmed a settlement where the same sort of thing happened. That was an employment discrimination case, but the case was amended, additional class members were added, additional claims for relief were added. So it's not ñ Nothing like the scope of this. I mean, I guess that's true in the sense that you were adding people and you weren't adding products like we are adding here. Officers for Justice just dealt with San Francisco policemen. There just weren't that many San Francisco policemen. It wasn't nationwide. It wasn't a whole lot of different places or products. Sure, Your Honor. I think that the suit here was always a nationwide class action as well. So the nationwide aspect didn't change. But I take the point that the number of products changed. This came as a surprise to nobody. In the MOU itself, which counsel referred to, the MOU says that the parties will in good faith negotiate to add additional products to the settlement. That MOU was filed publicly after at least the tentative agreement was reached. It was something that Judge Pappas had presided over and certified that there was no collusion. So there was no surprise that the number of products or what the products were, were changed. But after Judge Pappas and the mediation, it is true, is it not, that the statement that was being relied on was with regard to the MOU and there was no later statement by Judge Pappas, although he continued to participate. Is that right? That's exactly correct, Your Honor. And if Judge Pappas had, and there's nothing in the record to indicate that Judge Pappas had any concerns about the ultimate settlement that was reached. But if he had, he could have taken steps. He could have withdrawn, confidentially may have limited some of the things that he could have done. But he certainly would not have continued on. And there's just simply nothing in the record, and this is what motivated Judge Houston's decision. There's nothing in the record to indicate that there was any collusion. And so not only did Judge Pappas stay on, but there's just nothing to sort of support the theory that maybe something about the settlement could have possibly been collusion. I guess it depends what you call collusion. I mean, clearly an agreement was made to expand the class and the coverage, which had the effect of precluding any other class suit from having any recovery, because there were then waivers. And this was certainly in the interest of the company, and it was in the interest of the plaintiff's counsel, because it presumably allowed them to get a bigger recovery for themselves. So, I mean, it depends what you call collusion, I guess. I mean, yes, everybody had motives to agree to this, but what they agreed to was to cut out other class actions, right? Well, I wouldn't say that they agreed to cut out other class actions. Dela Rosa, which was the other class action that was pending at the time and certification had already been granted in that case, was specifically excluded and carved out of the settlement here so that it wouldn't preclude Dela Rosa. But I gather that, and that's why, I mean, this is kind of, to my mind, sort of a pox on both your houses' gates. I mean, the Dela Rosa lawyers who are the Gonzales lawyers were also seeking, it appears, a global salvage. That's exactly right, Your Honor. And that is in the record at ER 253 and 256. But that's exactly right. And I think, as you say, maybe Office Search for Justice is a different case, but the idea of the parties working in good faith to attempt to make the settlement include more products, I don't think is something that's particularly out of the ordinary. Judge Wardle, you asked what the fee award was in Dela Rosa. It was $750,000 for that one product that was just to California. So your interest, I guess, in entering into this settlement, or your client's interest, is really you could foresee that given the number of products you have, that firms could file a class action lawsuit picking off one or two products at a time, and then you'd be entering into, if you have 800 products, 800 different settlements, and you just wanted to put this whole problem behind you in one big settlement. So I don't think I'd characterize it as the reason that my client wanted to enter the settlement. Wouldn't it be a reason just to preclude a series of lawsuits picking up? I mean, to the extent the labeling has to be changed in every product, I could foresee that. If I was a partner at a firm representing defendants in class actions, I could foresee that as being one of your big motivations for amending the complaint. Again, it certainly, it was not irrelevant, I would say, to the settlement. But let me talk a little bit about the 800 products because I feel like that number has been thrown around a little bit. If you look at ER 1192, which is actually the page, the attachment to the settlement agreement where it lays out the products, there are 23 products that are enumerated in that settlement. And of those 23 enumerated products, 6 of them are Boron's most popular products and account for over 80% of Boron sales. There's testimony in the record that a silo alone represents, I believe, it's 56% of Boron sales just within the mass market channel. So even though there are a lot of different products, that 24th category, the sort of the catch-all category, for the most part is generic versions of the categories 1 through 23 and other branded versions, which is to say the version that Boron sells to Whole Foods and Whole Foods slaps a label on it and then sells it on its own. So that 24th category really mostly encompasses that first 23. And so the other point I would make is that for the generics and the other branded and some versions of the other 23 products, for some of them there are very, very few sales. And so without including those products in this sort of settlement that's more of a global settlement, I'm not sure that the money at stake would have led to other class action suits or other lawsuits about those individual products. And so I think including those products in this settlement ultimately allows those people that purchased those products that maybe otherwise wouldn't have filed a suit to actually get some recovery in this case. Can I come back to this 5,800 claims? It seems like that's an awful small amount of claims, leaving an awful lot of money left for distribution. Does that say something about the possible inadequacy of the notice in this case? I don't think so, Your Honor. I think that's always the concern. But I think that 5,800 claims in a class action settlement like this where people are submitting claims, I don't think that that's an incredibly small number. I think that that is a number that fits within the range of basically sort of what's expected ultimately when there is a settlement like this. I think that this Court has noted before that just a couple percent of actually claims being filed is unfortunately not really outside, is not outside the norm. But turning to the notice. I think it's partly on, I mean, the claim here, again, isn't that anybody was getting hurt. It's that they just weren't getting benefited, which many of them probably well knew. I mean, you know, you buy the stuff and you hope for the best, but. I think that that's exactly right, Your Honor. Not only does the settlement not cover personal injury, but it actually excludes from the settlement personal injury claims. So if there was a personal injury, somebody could still bring that claim. And counsel talked about, you know, a limit on these products, a cap on the amount of settlement. For the most part, these products sell for between $7 and $20. For somebody who has no receipt, as long as they swear or affirm that they purchased the product, they could still get $10 per product, which in some instances could be more than they actually paid for the product. But a cap of $50 per household. But these are not expensive products. And if somebody has purchased $50 worth of these products, or especially $100 worth of the products, and they purchase these products over and over again, there's probably a reasonable argument that they think that the product has been effective. And so not only have they not been harmed, they've potentially benefited from the product. Turning, Judge Smith, to your question about notice, the notice in this case I think was targeted in this regard. Boron and the class counsel looked at who are the people that purchase homeopathic drugs. And based on that information, based on marketing studies and information that was shared between the parties, they came up with a notice plan that was aimed at those people. Wait, who are those people? Those people are consumers of homeopathic drugs, specifically U.S. adults who trust homeopathic remedies. They are more than 25% more likely than the public to use the Internet almost on a daily basis. They're 17% more likely to read magazines. By contrast, they're 5% less likely than the general public to read newspapers, 7% less likely to watch TV, and 12% less likely to listen to the radio. So where did you put the notice? So the notice occurred in several different ways. For the customers who we had their contact information for, they received direct notice in the way that notices received in other cases. For everybody else, there was publication in the USA Today as well as in two health magazines that have a total circulation of about over 1.5 million. There was also a press release that was to an organization that then sends those press releases to local and national newspapers as well as to websites, TV and radio. And then one of the focuses of the notice was through online notice. Advertisements that pop up on your computer on the side of pages. If you go to CNN.com, on the side of the page there are all sorts of advertisements. There would be an advertisement for the settlement or the banner at the top or the bottom of the page. So the attempt was to aim the notice at the people that actually are likely to purchase these products, are likely to be the class members. And so that's why I think that the notice here was an attempt to really define those people and target those people that actually purchased the products. I guess we should pay attention to those pop-up ads, huh? Of course, Your Honor. Thank you. All right. Thank you, counsel. I'll give you an extra minute. Thank you, Your Honor. Your Honor, I want to point out, separate apart from even if you disagree with the collusion analysis that I provided you, Your Honor, under the Churchill, eight Churchill Village factors, the amount offered as part of the settlement is one of the key factors to be considered. And, Your Honor, it is undisputed that less than 1 percent of the revenues of during the class period wound up being the ultimate settlement agreement of $5 million as a class fund, less than 1 percent. Your Honor, that's not even close to being what the class, in this case, deserved to receive, given the scope of that release. I think I'm going to go back to my same question. No matter what the settlement and no matter what the judgment, if it were litigated, you'd still have the distribution problem. So unless there's something wrong, in other words, suppose they had gotten $25,000, then there's just $1 million, then there just would have been more money that went to consumer union, but the class wouldn't have gotten it. Well, Your Honor, we did challenge in our opening brief the fact that the notice plan was defective. Did you ever make any specific suggestions about how to do it differently? Well, one in particular was that, Your Honor, the notice plan did not disclose the amount of attorneys' fees that were going to be recovered, which in this case That's a different question. But in terms of how to distribute the notices, how would you do that? Did you ever come up with a different plan? Did you say, if you had said to the judge, well, they shouldn't do it this way, they should do it that way, did you do that? Your Honor, I believe we did. All right. Well, what was it that way? What should they have done they didn't do? Why did you tell the judge they should have done it they didn't do? Your Honor, I don't have that specifically in front of me. But, Your Honor, we definitely did challenge the notice plan as being defective and the fact that it's a small one. But it's no use to challenge it as being defective if you don't have an alternative. Well, Your Honor, the reliance on one, I think it was one health magazine and I said there were two, actually. Okay. I believe it was one based on the Well, I was just told there were two. So this guy, your opponent is telling me a story that's not true. He just stood up and said there were two. Your Honor, I'll take that at face value. The, Your Honor, the, there could have been, Your Honor, this is a nationwide class action, so there could have been different publications other than Internet notice. Well, right, but if you're an objector and you go to the district court and you say we object, this isn't a good notice, it seems to me the judge would have been happy to change it if you told him what to do. You should do this. Did you do that? Your Honor, I believe we did so. But you can't tell me how. Well, it's in the record in terms of our objections. It's really useful to come up here and argue if you don't know your own record. Thank you, counsel. Thank you, counsel. Thank you. Gonzales v. Boren will be submitted.
judges: Smith, Wardlaw, Berzon